UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| Iowa Voter Alliance, Todd Obadal, Michael C. Angelos, Diane L. Holst, | Case No. 20-2078 LTS/KEM |
| Plaintiffs, | |
| vs. | |
| Black Hawk County and Scott County, | **Memorandum in Support of Motion for Temporary Restraining Order** |
| Defendants. | |

The Plaintiffs, based on federal preemption, seek a temporary restraining order enjoining Black Hawk County and Scott County from accepting and using private federal election grants.

**Statement of Facts**

The Center for Tech and Civic Life (CTCL) is a non-profit organization providing federal election grants to local governments.[1] The CTCL was founded in 2012 by Tiana Epps-Johnson, Donny Bridges, and Whitney May. The CTCL headquarters is in Chicago, Illinois. The CTCL states that they are "a team of civic technologists, trainers, researchers, election administration and data experts working to foster a more informed and engaged democracy, and helping to modernize elections." CTCL's mission on its website includes training public election officials to inform and mobilize voters. CTCL's founders—Epps-Johnson, Bridges, and May—all previously worked at the New Organizing Institute (NOI), a center dedicated to training progressive groups and Democratic campaigns in digital campaigning strategies. NOI's executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012. Funders of CTCL include progressive groups such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation. CTCL is associated with Rock the

---

[1] For background information on CTCL, see https://www.techandciviclife.org/our-work.

Vote, who despite their non-partisan claims, has regularly featured progressive policies in its efforts to mobilize young people in elections. Along with Rock the Vote and The Skoll Foundation, CTCL lists Facebook as a partner in their efforts. On September 1, Mark Zuckerberg and Priscilla Chan announced their $300 million investment to promote "safe and reliable voting in states and localities." *Ex. B.* Of that $300 million, $250 million is going toward private federal election grants.

**CTCL's 2020 private federal elections grant application process.**

In May 2020, CTCL began its private federal election grants by transmitting $100,000 to the City of Racine, Wisconsin. See Exhibit C. CTCL authorized Racine to distribute $10,000 of the grant to the Cities of Green Bay, Kenosha, Madison and Milwaukee. *Id.* The grant was conditioned upon development of a June 15, 2020 Wisconsin Safe Voting Plan which occurred two weeks later. *Id.* Later, CTCL began marketing to local election offices the federal election grants as "COVID-19 Response Grants":

> We provide funding to U.S. local election offices to help ensure they have the critical resources they need to safely serve every voter in 2020.

*Ex. A.* CTCL states that it intends to award $250,000,000 of private federal election grants to local election offices for the November 3, 2020 elections and provides an application link to apply for the CTCL's private federal election grants:

> The Center for Tech and Civic Life (CTCL) is excited to expand our COVID-19 Response Grant program to all U.S. local election jurisdictions. Backed by a generous $250M contribution, CTCL will provide grants to local election jurisdictions across the country to help ensure you have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted.

<p align="center">**APPLY FOR A COVID-19 GRANT**</p>

> The deadline to apply is October 1, 2020. Questions about the COVID-19 grant application or process? Email us at help@techandciviclife.org.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

**CTCL's private federal election grants are targeted toward counties and cities with demographics that show overwhelmingly progressive voters.**

As the chart below shows, CTCL's private federal election grants are targeting counties and cities with demographics showing high rates of progressive voters. Only one of the top 18 grants went to a city or county carried by Trump and that grant was for $289,000 while the remaining $51,317,215 went to Democratic counties.  In other words, a total of 0.005 (or ½ of 1%) of the total funds in the 18 largest grants provided by CTCL went to counties or cities where Trump won in 2016.  Accordingly, 99.5% of these funds went to counties or cities carried by Clinton in 2016.

| County | CTCL Grant | Clinton | Trump | D |
|---|---|---|---|---|
| Dallas County, TX | $15,130,433 | 60.22% | 30.44% | D |
| Philadelphia, PA | $10,000,000 | 84.30% | 15.32% | D |
| Harris County, TX | $9,600,000 | 56.45% | 43.55% | D |
| Fulton, GA | $6,000,000 | 68.89% | 27.40% | D |
| Cobb, GA | $5,600,000 | 48.89% | 46.69% | D |
| Wayne County, MI | $3,512,000 | 96.83% | 2.18% | D |
| Delaware, PA | $2,200,000 | 65% | 35% | D |
| Bexar, TX | $1,900,000 | 54.19% | 40.76% | D |
| Cameroon, TX | $1,800,000 | 64.60% | 32.10% | D |
| Hinds, MS | $1,500,000 | 71.39% | 26.69% | D |
| Centre, PA | $863,828 | 48.71% | 46.32% | D |
| Richland, SC | $730,000 | 64.01% | 31.10% | D |
| Charleston, SC | $695,000 | 50.64% | 42.78% | D |
| Lucas, OH | $544,624 | 56.10% | 38.32% | D |
| Hays, TX | $289,000 | 49.50% | 50.40% | R |
| Onondaga, NY | $286,960 | 53.89% | 40.13% | D |
| Scott, IA | $286,870 | 47.50% | 46% | D |
| Blackhawk, IA | $267,500 | 50.60% | 43.30% | D |
| **Total:** | **$51,606,215** | **60.90%** | **34.99%** | |

**CTCL's 2020 private federal election grants**

In 2020, CTCL has provided private federal election grants to cities and counties in at least Iowa, Texas, Pennsylvania, Michigan, Wisconsin, Minnesota, South Carolina and Georgia. None of these private federal election grants have been approved by Congress or the Elections Assistance Commission.  All these states have something in common: state legislatures who will not accept

CTCL's private federal elections grants. So, CTCL, to accomplish its objective of turning out progressive votes in the urban counties and cities, has circumvented these state legislatures by recruiting local governments to apply and agree to accept CTCL's private federal election grants.

**Under Iowa law, the Secretary of State, not CTCL, apportions federal and state election grants to the counties.**

Under Iowa law, the Secretary of State, not CTCL, apportions federal and state election grants to the counties. I.C.A. § 47.1; Iowa Admin. Code 721-27.1, et seq. On March 27, 2020, the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was signed into law. The Act included $400 million in new Help America Vote Act (HAVA) emergency funds, made available to states to prevent, prepare for, and respond to the coronavirus for the 2020 federal election cycle. This supplemental appropriation funding, distributed by the U.S. Elections Assistance Commission (EAC), provides states with additional resources to protect the 2020 elections from the effects of the novel coronavirus and otherwise promote fair elections. Additionally, on December 20, 2019, the federal Consolidated Appropriations Act of 2020 was signed into law. The Act included $425 million in new Help America Vote Act (HAVA) funds, made available to states to improve the administration of elections for Federal Office, including to enhance technology and make election security improvements. The 2020 HAVA Election Security Fund was the second new appropriation for HAVA grants since FY2020. This funding provided states with additional resources to secure and improve election administration. Iowa received $4,859,545 under the CARES Act and $5,178,002 under HAVA. The total Iowa federal funding was $10,037,547. These federal monies were distributed to counties for federal election purposes.

## Argument

There are four factors to consider in determining whether a preliminary injunction, inclusive of a temporary restraining order, should issue: "(1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction;

(3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 112 (8th Cir. 1981) (en banc). In each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986). The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987).

I. **The Plaintiffs are likely to succeed on the merits.**

    A. **The Iowa Voters Alliance has a private cause of action and legal standing.**

The Iowa Voter Alliance[2] has a private cause of action and has legal standing to seek a pre-election injunction against Black Hawk County and Scott County accepting and using CTCL's private federal election grants for the November 3 election. The Supremacy Clause and HAVA confer a private cause of action and legal standing.

        1. **The Supremacy Clause provides a citizen's private cause of action and legal standing to bring preemption lawsuits against local governments regarding federal elections.**

The Supremacy Clause of the United States Constitution, Article VI, clause 2, provides a federal jurisdictional basis for a suit brought to enforce the provisions of federal election law. In *League of Women Voters v. Blackwell*, 340 F.Supp.2d 823 (N.D. Ohio 2004), the court held that the Supremacy Clause of the U.S. Constitution (U.S. Const. Art. VI, cl. 2) provides a basis for federal court jurisdiction of the League's suit that challenged an election official's actions relating to balloting procedures in federal elections as violative of HAVA, which has preemptive effect:

> It is clearly established that the Supremacy Clause grants the federal courts jurisdiction over such claims; conflict with a federal law raises a federal question pursuant to 28 U.S.C. § 1331…Because plaintiffs' claim is that defendant's actions in his official duties violate a federal law which has preemptive effect, the Supremacy Clause provides the cause of action

---

[2] For convenience, "Iowa Voter Alliance" includes all named Plaintiffs unless otherwise specifically identified.

and federal jurisdiction.

340 F.Supp.2d at 827–28 (citations omitted).  Similarly, in this case, the Supremacy Clause provides the private cause of action and § 1331 federal issue jurisdiction.

> **2.    HAVA, 52 U.S.C. § 21112, confers a private cause of action and legal standing to bring preemption lawsuits against local governments with regard to federal elections; the absence of any appropriate remedy in state law such as a pre-election injunction in an administrative action reflects the need for federal jurisdiction.**

HAVA, 52 U.S.C. § 21112, confers upon the Iowa Voter Alliance a private cause of action and legal standing. It fits the statutory category of "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)." As to the Iowa Voter Alliance's prospective remedies sought in this Court, HAVA, 52 U.S.C. § 21112, titled "Establishment of State-based administrative complaint procedures to remedy grievances," guarantees an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)" of HAVA.  Under section (a) of 52 U.S.C. § 21112, Iowa, having received federal HAVA payments, is "required to establish and maintain State-based administrative complaint procedures which meet the requirements of paragraph (2)." Paragraph (2), among other things, requires that Iowa provide that:

> (F) If, under the procedures, the State determines that there is a violation of any provision of subchapter III, the State shall provide the *appropriate remedy*.

(Emphasis added.)

However, in this case, Iowa Administrative Code ch. 721-25 has failed to provide the federally required "appropriate remedy" to "any person who believes that there is… [a HAVA] violation that has occurred, is occurring, or is about to occur" because there is effectively no pre-election injunctive relief allowed under Iowa Administrative Code ch. 721-25.  Iowa Administrative Code ch. 721-25 fails

to provide the immediate injunctive relief required to stop the defendants from accepting and using CTCL's private federal election grants before the November 3, 2020 election. Iowa Administrative Code ch. 721-25 authorizes no one, not even the Iowa Attorney General, to pursue injunctive relief for HAVA violations against Iowa's local governments. Iowa Administrative Code ch. 721-25 is legally insufficient to satisfy the federal "appropriate remedy" requirement for "any person" filing a HAVA complaint in Iowa to obtain pre-election injunctive relief. Because Iowa Administrative Code ch. 721-25 does not provide the federally-required "appropriate remedy" under 52 U.S. Code § 21112, plaintiffs have a private cause of action and legal standing under 52 U.S.C. § 21112 to pursue pre-election prospective declaratory and injunctive relief in federal court.

### 3. Voter standing regarding federal elections exists when the government favors demographic groups the same way it does when the government disfavors demographic groups.

Federal courts enforce a three-part test for Article III standing: that is the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. ——, ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). The Supreme Court has long recognized that a person's right to vote is "individual and personal in nature." *Gill v. Whitford*, 138 S.Ct. 1916, 1929 (U.S. 2018), *quoting, Reynolds v. Sims,* 377 U.S. 533, 561 (1964). Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Gill,* 138 S.Ct. at 1929, *quoting Baker,* 369 U.S. 186, 206 (1962). The Supreme Court in 2018 expressed an openness to standing based on other "possible theories of harm." *Gill*, 138 S.Ct. at 1931.

Voter standing regarding federal elections exists when the government favors demographic groups the same way it does when the government disfavors demographic groups. The court in *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) summarized this way, "[p]arity of reasoning suggests that a government can violate the [Delaware] Elections Clause if it skews the

7

outcome of an election by encouraging and facilitating voting by favored demographic groups." In a similar way, CTCL's private federal election grants cause the government to violate neutrality which injures the Plaintiffs by skewing the election outcomes as CTCL intends. Iowa Voter Alliance's injury is caused by the government's favoritism of progressive demographic groups within Black Hawk County and Scott County—just as if Iowa Voter Alliance itself were being suppressed.

The plaintiffs also have standing because the private federal election grants tortiously interfere with their Election Clause rights to fair, equal and uniform elections. The elements of the tort of interference with a prospective business advantage or contractual relationship ... are the following: (1) the plaintiff had a prospective contractual or business relationship; (2) the defendant knew of the prospective relationship; (3) the defendant intentionally and improperly interfered with the relationship; (4) the defendant's interference caused the relationship to fail to materialize; and (5) the amount of resulting damages. *See, e.g., Blumenthal Inv. Trusts v. City of West Des Moines,* 636 N.W.2d 255, 269 (Iowa 2001); *Gen. Elec. Capital Corp. v. Commercial Servs. Grp., Inc.,* 485 F. Supp. 2d 1015, 1025 (N.D. Iowa 2007). Here, CTCL knew of the plaintiffs' third party beneficiary rights, arising from legal and contractual relationships between the federal government and the state, to fair, equal and uniform elections. CTCL's private federal election grant to Black Hawk County and Scott County have interfered with plaintiffs' third party beneficiary rights to fair, equal and uniform elections.

- **B. Black Hawk County's and Scott County's CTCL private federal election grants are in a subject area of core governmental responsibility, federal elections, where public-private partnerships are constitutionally impermissible and where exclusive public funding is required.**

Black Hawk County and Scott County receive federal moneys through the Secretary of State to conduct federal elections.[3] But, Black Hawk County and Scott County also chose to seek and accept

---

[3] *See e.g.* Iowa Code, § 47.1; Iowa Code of Regulations § 721-27.7.

private moneys from CTCL. In receiving the CTCL $554,370.00 grants, it created a public-private relationship, privatizing in part, the conduct of federal elections. As the previously presented facts reveal, the CTCL's private federal election grants were provided to Black Hawk County and Scott County.

*Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group. The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law. The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.* The court stated that the government favoring a demographic group was equivalent to the government disfavoring a demographic group:

> Historically, the law has focused on forms of "improper influence" that have interfered with the voting rights of disfavored demographic groups by dissuading or preventing them from voting through blatant means like fraud, violence, and intimidation. A government certainly violates the Elections Clause if it skews the outcome of an election in this manner. Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups. In both situations, the government has diminished the voting rights of one portion of the electorate and enhanced the voting rights of another portion of the electorate. In neither case is the election "free and equal."

*Id.* As a case of first impression, no other case is analogous to the current Black Hawk County and Scott County public-private partnership in the context of federal elections. However, other cases show the need to announce the constitutional impermissibility of such public-private relationships regarding core governmental responsibilities.

The Supreme Court in *Caperton v. A.T. Massey Coal Co., Inc.,* 2259–63, 556 U.S. 868, 876–82 (2009), held that a state appellate judge erred by not recusing himself in a case where a party had donated $3,000,000 to the judge's judicial campaign:

9


Case 6:20-cv-02078-LTS-KEM    Document 6-2    Filed 10/06/20    Page 9 of 20

> We conclude that there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent. The inquiry centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election.
>
> Applying this principle, we conclude that Blankenship's campaign efforts had a significant and disproportionate influence in placing Justice Benjamin on the case. Blankenship contributed some $3 million to unseat the incumbent and replace him with Benjamin. His contributions eclipsed the total amount spent by all other Benjamin supporters and exceeded by 300% the amount spent by Benjamin's campaign committee.

*Id.* at 884. These sort of public-private partnerships where private parties significantly finance judges' campaigns are not allowed within the judiciary.

Similarly, in *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), the Supreme Court drew such a line finding a public-private partnership constitutionally impermissible. In *Kiryas*, the New York legislature sought to create a homogenous school district for Satmar Hasidic Jews and did so by statute. This "religious" motive was improper for the state and the statute forming the new district was stuck down. *Id.* at 691. Additionally, in *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (U.S. 2001), the Supreme Court held another public-private partnership unconstitutionally impermissible. Here, the local prosecutor, concerned about crack babies, teamed up with the local hospital to develop a program seeking to prevent expecting mothers from using cocaine during the pregnancy. They developed a program where the hospital would test for the presence of cocaine and provide a program to help with abstinence. If the patient refused, the results were shared with the prosecutor's office that in turn would encourage participation at the threat of prosecution. The Supreme Court found the entanglement of public and private interests sufficient to conclude the blood test by the hospital was a Fourth Amendment violation by the state. *Id.* at 86.

As previously mentioned, the conduct of elections is a core public responsibility that must be publicly-funded. Governmental entities are expected to remain neutral. Scholars have warned of the hazard presented by partisan government conduct: "[P]ermitting the government to depart from a

neutral position would threaten both the reliability of the election result as an expression of the popular will and the appearance of integrity crucial to maintaining public confidence in the electoral process."[4] *See also Bullock v. Carter*, 405 U.S. 134, 145 (1972) (recognizing states' interests maintaining integrity in election processes).

The idea of the federal and state government exclusively funding federal elections is to eliminate undue influence and the appearance of undue influence by private parties. With the entanglement of public and private interests, CTCL's private funding of federal elections introduces undue influence and the appearance of undue influence into federal elections—which should be declared constitutionally impermissible.

### C. Black Hawk County's and Scott County's acceptances of the CTCL grants are preempted by federal and state law.

Federal law preempts private federal election grants to counties and cities. There is no legal authority under the Elections Clause nor 52 U.S.C. § 20901 for local governments to accept and use private federal election grants.

### 1. Counties and cities, as political subdivisions of States, have no power to have federal election policies under the Elections Clause.

Counties and cities, as political subdivisions of States, have no power to have federal election policies under the Elections Clause. The Elections Clause states:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

---

[4] Steven J. André, Government Election Advocacy: Implications of Recent Supreme Court Analysis, 64 Admin. L. Rev. 835, 851 (2012), *citing* Note, The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns, 93 Harv. L. Rev. 535, 554, 554 n.112 (1980) (observing that "[t]he [United States Supreme] Court has explicitly recognized that the validity of elections as bona fide expressions of the popular will depends as much upon citizens' faith that the electoral process is free from government tampering as on the actual fairness of that process").

U.S. Const., art. I, § 4, cl. 1. The Election Clause's phrase "manner of holding elections" for Senators and Representatives "refers to the entire electoral process, from the first step of registering to the last step of promulgating honest returns." *U.S. v. Manning,* 215 F. Supp. 272, 284 (W.D. La. 1963). The Supreme Court has stated that the Elections Clause has two functions: "Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013). The Supreme Court states that the Elections Clause invests the state with power over Congressional elections subject to Congressional control:

> The power of Congress over the "Times, Places and Manner" of congressional elections "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex parte Siebold,* 100 U.S. 371, 392, 25 L.Ed. 717 (1880).

*Inter Tribal Council of Arizona, Inc.,* 570 U.S. at 9. So, the States have "no power qua sovereigns" regarding federal elections; whatever powers the States have regarding federal elections is because Congress allows it. *Fish v. Kobach*, 840 F.3d 710, 731–32 (10th Cir. 2016). Nor does the Constitution impose on the United States the costs incurred by Congress's alterations of federal elections, traditionally borne by the States. *Voting Rights Coalition v. Wilson,* 60 F.3d 1411, 1416 (9th Cir. 1995).

To be sure, Governors and independent redistricting committees, established under state law, have been found constitutionally permissible under the Elections Clause. *Smiley v. Holm,* 285 U.S. 355 (1932) (whether Governor of State through veto power shall have part in making of state laws concerning the time, place and manner for holding elections is matter of state policy); *Arizona State Legislature v. Arizona Independent Redistricting Com'n,* 576 U.S. 787 (2015) (Elections Clause did not preclude State's people from creating commissions operating independently of state legislature to establish Congressional Districts). But, in contrast, counties and cities which are political subdivisions

of the state have never been held to be sovereigns for federal election policies. Under the Elections Clause, counties and cities have no power to have federal election policies.

2. **Since counties and cities have no federal election powers, counties and cities cannot dictate federal election outcomes, have no power to favor or disfavor candidates, have no power to favor or disfavor demographic groups and have no power to circumvent constitutional and other federal legal restraints.**

Since counties and cities do not have powers to have federal election policies, counties and cities have no power to dictate federal election outcomes, have no power to favor or disfavor demographic groups, have no power to favor or disfavor candidates, and have no power to evade constitutional and other federal legal constraints.

Under the Elections Clause, the States and their political subdivisions (counties and cities) cannot dictate federal election outcomes; instead, fair and uniform federal elections are required. From the time of the Elections Clause, the States were to prescribe the "time, place and manner" of U.S. House of Representatives elections subject to Congressional enactments. After 1913, the year the Seventeenth Amendment was enacted, states elected their U.S. Senators instead of the state legislatures appointing U.S. Senators. After 1913, the States were required to prescribe the "time, place and manner" of elections of U.S. Senators as they had been doing for Representatives of the U.S. House—again subject to Congressional enactments.

Under the Elections Clause, the States and their political subdivisions (counties and cities) cannot favor or disfavor candidates. The Supreme Court in *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, (1995), held unconstitutional an Arkansas law that prohibited the candidacy of an otherwise eligible Congressional candidate if he or she had already served three terms in the House of Representatives or two terms in the Senate. The Supreme Court held that the ballot restriction was an indirect attempt to impose term limits on congressional incumbents that violated the Qualifications Clauses in Article I of the Constitution rather than a permissible exercise of the State's power to

regulate the "Times, Places and Manner of holding Elections for Senators and Representatives" within the meaning of Article I, § 4, cl. 1. Similarly, the Supreme Court held unconstitutional an initiative amending the Missouri Constitution to require that any failure of United States Senators or Representatives, or nonincumbent candidates for those offices, to support term limit provisions be noted on federal election ballots:

> The [Elections] Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections, *e.g., Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514, but does not authorize them to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints, *U.S. Term Limits,* 514 U.S., at 833–834, 115 S.Ct. 1842.

*Cook v. Gralike*, 531 U.S. 510, 511 (2001).

Under the Elections Clause, States and their political subdivisions (counties and cities) are not to discriminate in favor of or in disfavor of a demographic group. For example, the Supreme Court stated that the right to vote in federal elections includes the right against discrimination:

> This new constitutional right was mainly designed for citizens of African descent. The principle, however, that the protection of the exercise of this right is within the power of congress, is as necessary to the right of other citizens to vote as to the colored citizen, and to the right to vote in general as to the right to be protected against discrimination. The exercise of the right in both instances is guaranteed by the constitution, and should be kept free and pure by congressional enactments whenever that is necessary.

*The Ku Klux Cases*, 110 U.S. 651, 665 (1884). Consistently, the Voting Rights Act of 1965 is a landmark piece of federal legislation in the United States that prohibits racial discrimination in voting. Designed to enforce the voting rights guaranteed by the Fourteenth and Fifteenth Amendments to the United States Constitution, the act secured the right to vote for racial minorities throughout the country, especially in the South.

Consistently, the States and their political subdivisions (counties and cities) under the Federal Elections Clause also cannot favor a demographic group. A government favoring a demographic group, similar to the government disfavoring a demographic group, skews election outcomes. "Parity of reasoning suggests that a government can violate the [Delaware] Elections Clause if it skews the

outcome of an election by encouraging and facilitating voting by favored demographic groups." *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

*Red Clay Consol. Sch. Dist.* reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group. The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law. The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.* The court stated that the government favoring a demographic group caused equivalent injury to a voter as the government disfavoring a demographic group. *Id.*

Finally, under the Elections Clause, States are not to circumvent constitutional or other federal legal restrictions. As discussed above, the Elections Clause requires that the Constitution and other federal law preempts any inconsistent action of a State or its political subdivisions.

3. **Elections Clause preemption is not subject to the Plain Statement Rule which derives from the Supremacy Clause's presumption against preemption; different canons of statutory interpretation apply.**

Elections Clause preemption is not subject to the Plain Statement Rule. The Plain Statement Rule requires that, when Congress intends to preempt state law, "it must make its intention to do so 'unmistakably clear in the language of the statute.' " *Gregory*, 501 U.S. 452, 460 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)). However, because Congress's regulation of federal elections displaces state regulations, and because the states have no power as sovereigns to regulate such elections, the plain statement rule, as a creature of the presumption against preemption, has no work to do in the Elections Clause setting; it is unnecessary to prevent inadvertent or ill-considered preemption from altering the traditional state-federal balance. *Fish v. Kobach*, 840 F.3d 710, 731–32 (10th Cir. 2016), *citing Inter Tribal*, 133 S.Ct. at 2257 & n.6.

Importantly, recognizing the uniqueness of the Election Clause, the Ninth and Tenth Circuits apply a canon of statutory interpretation considering "the relevant congressional and state laws as part of a single statutory scheme but treating the congressional enactment as enacted later and thus superseding any conflicting state provision." *Fish v. Kobach*, 840 F.3d 710, 726 (10th Cir. 2016), *citing Gonzalez v. Arizona*, 677 F.3d 383, 394 (C.A.9 (Ariz.),2012)

4. **Under 52 U.S.C. § 20901, counties and cities, as political subdivisions of the State, are preempted from receiving and using private federal election grants to improve federal elections.**

Title 52 of the United States Code (52 U.S.C.), entitled "Voting and Elections", is a codification of the "general and permanent" voting and election laws of the United States federal government. Subtitle I covers "Voting Rights." 52 U.S.C. §§ 10101 – 10702). Subtitle II covers "Voting Assistance and Election Administration." 52 U.S.C. §§ 20101 – 21145. Subtitle III covers "Federal Campaign Finance" 52 U.S.C. §§ 30101 – 30146. 52 U.S.C. § 21141 defines "State" to exclude counties and cities:

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

Consistent with the Elections Clause, Title 52 imposes federal legal requirements on the States regarding federal elections.

52 U.S.C. § 20901, titled "Payments to States for activities to improve administration of elections," establishes an exclusive prerogative for the federal government to grant funds to states to improve administration of federal elections. 52 U.S.C. § 20901 requires the States to use federal moneys to implement federal policy regarding federal elections:

> (b)USE OF PAYMENT
> (1)IN GENERAL A State shall use the funds provided under a payment made under this section to carry out one or more of the following activities: (A) Complying with the requirements under subchapter III. (B) Improving the administration of elections for Federal office. (C) Educating voters concerning voting procedures, voting rights, and voting technology. (D) Training election officials, poll workers, and election volunteers. (E)


> Developing the State plan for requirements payments to be submitted under subpart 1 of part D of subchapter II. (F) Improving, acquiring, leasing, modifying, or replacing voting systems and technology and methods for casting and counting votes. (G) Improving the accessibility and quantity of polling places, including providing physical access for individuals with disabilities, providing nonvisual access for individuals with visual impairments, and providing assistance to Native Americans, Alaska Native citizens, and to individuals with limited proficiency in the English language. (H) Establishing toll-free telephone hotlines that voters may use to report possible voting fraud and voting rights violations, to obtain general election information, and to access detailed automated information on their own voter registration status, specific polling place locations, and other relevant information.

Thus, federal election moneys are distributed to the States under the federal policy limitations of 52 U.S.C. § 20901. The States then determine how much of the money is distributed locally.

On December 20, 2019, prior to the COVID-19 pandemic, on the federal Consolidated Appropriations Act of 2020 was signed into law. Public Law No: 116-94 (Dec. 20, 2019). The Act included $425 million in new Help America Vote Act (HAVA) funds, made available to states to improve the administration of elections for Federal Office, including to enhance technology and make election security improvements. On March 27, 2020, in response to the COVID-19 pandemic, the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was signed into law. Public Law No. 116-136 (Mar. 27, 2020). The Act included $400 million in new Help America Vote Act (HAVA) emergency funds, made available to states to prevent, prepare for, and respond to the coronavirus for the 2020 federal election cycle. The States, consistent with 52 U.S.C. § 20901, distributed most of the federal moneys to the counties and cities for federal election purposes. The counties and cities are bound by the federal policy limitations of 52 U.S.C. § 20901.

There is no legal authority under the Elections Clause nor 52 U.S.C. § 20901 for counties and cities, which are political subdivisions of the States, to accept and use private federal election grants. The Elections Clause does not authorize the political subdivisions of the State to have federal election policies. 52 U.S.C. § 20901 authorizes federal payments to States for the purpose of improving election administration. The states, in turn, distribute money to the counties and cities as their respective political subdivisions. 52 U.S.C. § 20901 does not authorize private federal election grants to counties

17
Case 6:20-cv-02078-LTS-KEM Document 6-2 Filed 10/06/20 Page 17 of 20

and cities. Private federal election grants to counties are legally unauthorized.

## II. The moving party will suffer irreparable injury absent the injunction.

The Iowa Voter Alliance, absent the injunction, will suffer irreparable injury. There is no administrative remedy that can be granted under HAVA or another federal or state statutory election law that will provide for immediate injunctive relief. In short, the Iowa Voter Alliance has no other option to challenge Black Hawk County's and Scott County's acceptance of private federal elections grants. Black Hawk County's and Scott County's acceptance of CTCL's grant reveals a public-private relationship that privatizes federal elections to skew the outcome of an election in an urban city of a favored demographic group. It skews the neutrality of an election which is the core governmental responsibility. *Red Clay Consol. Sch. Dist.*, 122 A.3d at 857–58. Threats of private unconstitutional interference with the November 3 elections pose the same type of "irreparable injury" and are analogous to "irreparable injury" for First Amendment deprivations. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008). "For this reason, the irreparable harm factor generally weighs in the movant's favor in First Amendment cases, although it is often intertwined with a court's evaluation of the likelihood of success on the merits." *Seaton v. Wiener*, 22 F.Supp.3d 945, 951 (D. Minn. 2014). Once the November election occurs, the damage to what is to be fair and uniform elections is complete. Without injunctive relief, the CTCL moneys will cause a non-conformity of uniform elections. This illegal public-private partnership causes the plaintiffs irreparable injury.

## III. The harm to other interested parties is little or none if the relief is granted.

The Iowa Voter Alliance absent the injunction, will suffer harm. Black Hawk County and Scott County have admitted that despite the anticipated increase in voting, namely absentee ballot voting,

18
Case 6:20-cv-02078-LTS-KEM   Document 6-2   Filed 10/06/20   Page 18 of 20

there would be no fiscal impact.[5] Hence, the need of the private federal election grants is questionable at best. Black Hawk County and Scott County has access to HAVA moneys and additional Cares Act moneys, specifically for election related needs—as does every other city or county in Iowa responsible for conducting the 2020 federal elections. On the other hand, the introduction of a public-private relationship in the federal election context is a first-time foreign element not contemplated by either HAVA or the Iowa Legislature since the laws exclusively control the conduct and moneys related to federal elections. There is no question of the historical success and consistency of Black Hawk County and Scott County in their election processes considering the percentages of voters casting ballots. What also is notable are the voter outcomes—predominately progressive. Hence, the grants from CTCL raise sufficient questions as to the propriety of the public-private created relationship and the facilitation of a favored demographic group. In short, injunctive relief to stay expenditures of the grant will cause little or no harm to the conduct of Black Hawk County and Scott County elections. Moreover, a state grant process is in place through the Secretary of State's office should Black Hawk County and Scott County need more moneys. By doing so, Black Hawk County and Scott County will stay true to their core public responsibilities in conducting elections consistent with federal and state laws. For these reasons, the balance of harms favors granting the motion.

**IV.     The public interest is aided by the preliminary injunction.**

The public interest, absent the injunction, will be impeded.  Black Hawk County's and Scott County's acceptance of CTCL's grant reveals a public-private relationship that privatizes federal elections to skew the outcome of an election in an urban city of a favored demographic group. It skews the neutrality of an election which is the core public responsibility of Black Hawk County and Scott County. *Red Clay Consol. Sch. Dist.*, 122 A.3d at 857–58. Threats of private unconstitutional

---

[5] Fahnlander Decl. Ex. D-3.

interference with the November 3 elections pose the same type of public interest analysis as in First Amendment deprivations. The public interest factor in First Amendment cases generally favors granting the injunction. *Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008) (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation"). The determination of where the public interest lies should depend on the likelihood of success on the merits of the Elections Clause challenge "because it is always in the public interest to protect constitutional rights." *Id.*; *see also Seaton*, 22 F.Supp.3d at 951. As discussed above, the Iowa Voter Alliance has no alternative administrative remedy. There is no other avenue to challenge the illegality of the public-private partnership. The harm that defendants will experience should they not receive CTCL's private federal election grant is little. Black Hawk County and Scott County can obtain additional funds from the state if they need it. For these reasons, the public interest favors granting the motion.

## Conclusion

For the foregoing reasons and to preserve Iowa's democratic elections, the Court should grant the temporary restraining order.

Dated: October 6, 2020.

/s/Vincent J. Fahnlander
Vincent J. Fahnlander, No. 9485
Special Counsel for Amistad Project of the
Thomas More Society
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Facsimile: (612) 341-1076
Email: fahnlander@mklaw.com
*Attorneys for Plaintiffs*