# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| IOWA VOTER ALLIANCE, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> BLACK HAWK COUNTY, et al., <br><br> Defendants. | No. C20-2078-LTS <br><br> **MEMORANDUM OPINION AND ORDER ON PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## I.  INTRODUCTION

This case is before me on a motion (Doc. 6) for a temporary restraining order (TRO) filed by plaintiffs Iowa Voter Alliance, Todd Obadal, Michael Angelos and Diane Holst.  Plaintiffs seek to prevent defendants Black Hawk County, Iowa, and Scott County, Iowa, from using private grants they obtained from the Center for Tech and Civil Life (CTCL) to help cover additional costs arising from conducting an election during the coronavirus pandemic.  Plaintiffs argue that the counties' receipt of private grants violates federal law and that allowing the counties to use the funds for the upcoming federal election on November 3, 2020, will result in further violations of federal law and their rights as voters.

The motion was filed October 6, 2020.  Defendants filed their resistance materials (Doc. 16, 17) on October 15, 2020.  I conducted a telephonic hearing on October 20, 2020.  Attorneys Vincent J. Fahnlander and Erick G. Kaardal appeared for plaintiffs, attorneys Katie L. Graham and Randall D. Armentrout appeared for Black Hawk County

and attorney Robert L. Cusack appeared for Scott County. After hearing the arguments of counsel, I took the matter under advisement.[1]

## II. DISCUSSION

A TRO is considered "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–30 (2d ed. 1995)). In determining whether to grant a TRO, the court must consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Because success on the merits is regarded as the most important factor, I will begin there. *See Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) ("Success on the merits has been referred to as the most important of the four [*Dataphase*] factors.").

### A. *Plaintiffs' Likelihood of Success on the Merits*

To show a sufficient likelihood of success on the merits to justify a TRO, plaintiffs need not prove that they will ultimately win the case. *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007). Nor must they prove that they are more likely than not to prevail. *Id.* Plaintiffs need only show that they have a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).

---

[1] Due to the expedited circumstances, with the 2020 election just two weeks away, I will dispense with a detailed recitation of the facts.

2

### 1. *Do Plaintiffs Have a Private Right of Action?*

The first dispute regarding the merits of this case is whether plaintiffs have a private right of action.[2] Plaintiffs argue that they have both standing[3] and a private right of action under the Supremacy Clause of the United States Constitution and the Help America Vote Act (HAVA), 52 U.S.C. § 21112.[4] However, in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), the Supreme Court held the Supremacy Clause does not itself create a private right of action. *Id*. at 325–26. Instead, when a private party seeks to prevent a state officer or entity from violating federal law on the basis of the Supremacy Clause, relief is available only in a court of equity and only if a private right of action is permitted by federal law. *Id.* at 326–28. Thus, for plaintiffs to have a private right of action, they must show that it exists under HAVA. They have failed to do so.

In *Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam), the Supreme Court summarily vacated a TRO because the parties who obtained it were "not sufficiently likely to prevail on the question whether Congress has authorized the District

---

[2] To establish a private right of action, plaintiffs must show that they are "member[s] of the class of litigants that may, as a matter of law, appropriately invoke the power of the court" to enforce a law. *Davis v. Passman*, 442 U.S. 228, 239 & n.18 (1979) ("[A] cause of action is a necessary element of [a plaintiff's] 'claim.'").

[3] In addition to challenging the merits of plaintiffs' claims, defendants have challenged the plaintiffs' standing. Doc. 16-1 at 3; Doc. 17 at 5–9. I will not address standing at this time but, instead, will leave the issue open for later argument.

[4] At the hearing, plaintiffs raised a new argument that they also have standing and/or a private right of action under the All Writs Act, 28 U.S.C. § 1651. However, the All Writs Act is a statute that authorizes courts to grant remedies "in aid of their respective jurisdictions and agreeable to the usages and principles of law" and does not, on its own, provide any ground for jurisdiction or a private right of action. *See Edelson PC v. Bandas Law Firm PC*, No. 16 C 11057, 2018 WL 723287, at *13 (N.D. Ill. Feb. 6, 2018); *West v. Spellings*, 480 F. Supp. 2d 213, 218 (D.D.C. 2007).

3

Court to enforce § 303[5] [of HAVA] in an action brought by a private litigant." *Id.* at 5. In support of this conclusion, the Court cited two cases – *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002), and *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) – in which it had emphasized that private rights of action must be created by Congress. In HAVA, Congress explicitly granted enforcement powers to the Attorney General and the states. 52 U.S.C. §§ 21111–21112. Congress did not state that a private party has the right to enforce HAVA's provisions.

Plaintiffs argue that they have an implicit right of action because (1) 52 U.S.C. § 21112 requires states receiving HAVA funds to establish administrative complaint procedures and (2) Iowa has violated § 21112 by failing to provide an adequate administrative remedy, immediate injunctive relief before an upcoming election, in Iowa Administrative Code § 721.25. However, the fact that Congress explicitly granted enforcement powers to the Attorney General and the states weighs strongly against finding an implicit right of action for private parties. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) ("[W]here Congress 'intends private litigants to have a cause of action,' the 'far better course' is for Congress to confer that remedy in explicit terms." (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979))); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 574 (1979) ("[The Supreme Court is] extremely reluctant to imply a cause of action . . . that is significantly broader than the remedy that Congress chose to provide."). For an implied private right of action to exist, a statute must "'displa[y] an intent' to create 'a private remedy,'" and plaintiffs have not shown, nor have I found, such statutory intent here. *Ziglar*, 137 S. Ct. at 1855 (quoting *Sandoval*, 532 U.S. at 286–87. If Iowa failed to provide a complaint procedure that complied with § 21112, the Attorney General would be the proper party to seek relief under HAVA.

---

[5] Section 303 of HAVA is codified at 52 U.S.C. § 21083. This is a different provision from the one at issue here but nothing in 52 U.S.C. § 21112 suggests a different conclusion.

Even if a private right of action could arise in the manner plaintiffs argue, it would not exist here because the state's administrative procedure does not violate HAVA or prevent plaintiffs from obtaining adequate relief. Although there is no procedural mechanism in the state's administrative complaint procedure analogous to a TRO, the state's administrative procedure is capable of providing injunctive relief before an election occurs. *See* Iowa Admin. Code § 721.25.9 (if a violation of HAVA is found, the violator may be prohibited "from taking [a] specified action with respect to a past, *immediately pending*, or *future* election."); § 721.25.11 ("For good cause, the presiding officer may extend or shorten the time to take any action, except as precluded by statute."). Plaintiffs have provided no evidence that the state administrative procedure could not conclude in time to provide the relief they seek before the upcoming election.

In short, plaintiffs have not demonstrated that a private right of action exists and, as a result, have not shown a chance of success on the merits.

### 2. *Are Plaintiffs Otherwise Likely to Succeed on the Merits?*

Even if a private right of action exists, plaintiffs have not demonstrated a chance of success on the merits. They argue that defendants' acceptance of the CTCL grants violates the Elections Clause and HAVA and creates an unconstitutional public-private partnership. They also argue private grants are unconstitutional because only public funds can be used for elections and using the accepted grant money would improperly dictate federal election outcomes, disadvantage certain demographic groups and candidates, and perhaps even result in disenfranchisement through election contests.

The Elections Clause of the United States Constitution, which is the origin of a state's authority with respect to federal elections, provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time make or alter such Regulations, except as to the Place of chusing Senators.

U.S. Const. Art. I, § 4, cl. 1. Plaintiffs have not provided any authority, nor have I found any, suggesting that the Elections Clause imposes specific limits or restrictions as to how a federal election must be funded. Instead, funding an election presumably falls into, or is an implicit power of, the state's authority over the "Manner of holding Elections" and is subject only to restrictions imposed by Congress. *See Cook v. Gralike*, 531 U.S. 510, 523–24 (2001).

In Iowa, the duty to fund elections is delegated to the counties. Iowa Code § 47.3; *id.* § 331.383 ("The [county] board shall . . . pay election costs as provided in section 47.3 . . . ."). Accepting the grants to help fund an election appears consistent with a county's powers under Iowa's home rule doctrine:

> A county may, except as expressly limited by the Constitution of the State of Iowa, and if not inconsistent with the laws of the general assembly, exercise any power and perform any function it deems appropriate to protect and preserve the rights, privileges, and property of the county or of its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents.

Iowa Code § 331.301. Facially, obtaining the grants was a "function . . . to protect and preserve the rights [and] privileges" of the counties' residents to vote and to "preserve and improve the peace, safety, health, welfare, comfort, and convenience of [those] residents" while they do so. Plaintiffs have not cited, nor have I found, any Iowa law that forbids counties from accepting private grants to fund an election.

Plaintiffs further argue that accepting private grants to help fund an election violates HAVA. However, nothing in HAVA, or its implementing laws at the state level, appears to forbid a county from accepting private grants to help fund an election. Indeed, HAVA is merely one source of funding to improve and modernize elections, not a statutory scheme governing how they are funded. *See Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012) (HAVA was enacted "to provide funds to States to replace punch card voting systems . . . and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish

minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." (citation omitted)); *see also* Iowa Admin. Code § 721.27.1.

While HAVA required states to make certain updates to their voting systems, it did not require states to obtain HAVA funds to do so. 52 U.S.C. § 20901 (providing for payment to states if "the chief executive officer of the State, or designee, in consultation and coordination with the chief State election official, notifies the Administrator not later than 6 months after October 29, 2002, that the State intends to use the payment in accordance with this section"). The same is true for counties obtaining HAVA funds from the state. Iowa Admin. Code § 721.27 ("Any Iowa county is *eligible* to receive [HAVA] funds [from the state]." (emphasis added)). Nothing in HAVA mandates that HAVA funds, or public funds in general, be the exclusive sources of election funding. Accepting grants from private entities does not, on its own, prevent compliance with HAVA or other state laws.

Plaintiffs also raise policy-based objections against permitting a county to receive private grants to fund an election. There may be valid policy reasons to restrict or regulate the use of private grants to fund elections. However, it is for Congress and/or the Iowa Legislature, not the judicial branch, to make those policy judgments. Moreover, the record contains no evidence supporting plaintiffs' accusations that CTCL's grants pose an actual risk of shaping the outcome of any election or of favoring any particular party or candidate. There is no evidence that CTCL has attempted to require counties to spend the funds in such a manner, nor that either defendant has done so.

For all these reasons, based on the record before me, plaintiffs have not demonstrated any chance of prevailing on the merits. For this reason, alone, the TRO must be denied. *See Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005). Nonetheless, I will briefly address the other TRO factors.

## B. Threat of Irreparable Harm to the Movant

Plaintiffs argue that the counties' use of the CTCL grants will cause harm because it will disadvantage certain groups and candidates and improperly influence the outcomes of the upcoming election. The TRO is needed, they argue, because no remedy will suffice after the election is over if the grant funds are used. However, as discussed above, plaintiffs have failed to show that the grants will cause the harm they allege. They point to no specific use of the funds that hinders their rights or that could influence the outcomes of the election. Because harm does not seem likely, let alone irreparable, there is little reason to try to prevent it.

## C. Balance of Harms

In contrast, the harm that would be inflicted on defendants if they are prohibited from using the election grants appears to be large. For example, in its application for a CTCL grant, Black Hawk County noted that it needed additional help funding the upcoming election because its budget for 2020 did not envision changes to voting patterns caused by the coronavirus:

> [T]the biggest challenge Black Hawk County faces is planning and executing an election that was not properly budgeted for, meaning Black Hawk County budgeted for a general election with a predicted 25,000 absentee ballots to process, stuff, and mail in the six weeks leading up to the election. Due to the coronavirus our office decided to do a countywide absentee ballot request mailer urging voters to vote by mail for this election; not something we have done in the past nor something we budgeted for. As stated, we anticipated 25,000 absentee ballots in total, we have already processed as much to date with another seven weeks to go. In addition, we had to hire an additional six full time election clerks to start a month earlier than expected, again something that we did not budget for.

Doc. 17-1 at 7. Black Hawk County also noted the need to provide the community with additional information regarding where to vote, due to a reduced number of polling sites, and for more personal protective equipment for poll workers. *Id.*

Enjoining defendants from using the CTCL grant funds would hinder their ability to meet their election needs and, thus, harm their residents who seek to exercise their right to vote. This is especially true given that the prohibition would issue so soon before the upcoming election, effectively changing the rules at the last minute. *See, e.g., Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (emphasizing that "lower federal courts should ordinarily not alter the election rules on the eve of an election"). The balance of harms weighs against the TRO, especially considering plaintiffs' failure to show a chance of success on the ultimate merits.

### D. *Public Interest*

The public interest also weighs against the TRO. As balancing the harms shows, the public stands to be harmed significantly more by prohibiting defendants from using the CTCL grants than by allowing their use. Additionally, as defendants have pointed out, they are only two of 64 counties in Iowa that have received CTCL grants. Prohibiting only these two counties from using the grants would put their residents at a disadvantage as compared to the residents of those counties that are not judicially restrained from utilizing CTCL grant money.

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motion (Doc. 6) for a temporary restraining order is **denied**.

**IT IS SO ORDERED.**
**DATED** this 20th day of October, 2020.

_____
Leonard T. Strand, Chief Judge

9
Case 6:20-cv-02078-LTS-KEM   Document 23   Filed 10/20/20   Page 9 of 9